FILED

14 APR -7 PM 1:20

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS, FLORIDA

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## (FORT MYERS DIVISION)

JOSEPH KAFKA, Individually
and on Behalf of All Others Similarly
Situated,

       Plaintiff,

                    **Case No.:**

v.

LIBERTY TRADING GROUP, INC., JAMES
CORDIER, MICHAEL GROSS;

       Defendants.

2:14-cv-197-FtM- 38DNF

_____/

### CLASS ACTION COMPLAINT

### I.    BACKGROUND

    1.    Plaintiff is a former customer of Liberty Trading Group, Inc. He sues on behalf of himself and thousands of other similarly situated persons who have lost money as a result of the acts and omissions of each of the defendants and the collapse of PFG in July 2012.

    2.    Shortly after the demise of MF Global, Liberty Trading represented to potential investors such as Plaintiff and the Class that PFG held all customer funds in segregated accounts "in accordance with all regulations mandated by the CFTC and the rules of the NFA." Each of the Defendants solicited Plaintiff and Class members and assured them that an investment with Liberty was safe. At the same time, PFG and Russell Wasendorf, Jr. and Sr. ("Wasendorfs"), were continuing a 20-year consistent scheme to rob more than $200 million from those same customer accounts.

1

3.      Each of the Defendants solicited Plaintiff's investment and they knew, or in the exercise of ordinary care, know that it had failed to conduct adequate due diligence and breached their legal duties owed to Plaintiff and Class members.

4.      Liberty arranged for the transfer of millions of dollars to PFG.

5.      James Cordier, Michael Gross, and Liberty Trading Group represented to Mr. Kafka that they were superior custodians, managers, and investors of customer funds. They also suggested that Mr. Kafka review the Liberty Trading Group brochures given to him and the internet site at http://www.libertytradinggroup.com/, in order to induce him to invest with Liberty Trading Group.

6.      Mr. Kafka directly relied upon the representations of Defendants Cordier, Liberty Trading Group, and the statements they made to him, including in their sales materials and on their internet site.

7.      On or about April 13, 2012 James Cordier and Liberty Trading Group solicited the Plaintiff Kafka to invest with Liberty Trading Group and to invest in PFG.

8.      On or about May 11, 2012, Mr. Kafka met with the Defendants at Liberty Trading Group and was solicited to invest in PFG.

9.      On or about July 5, 2012, each of the Defendants convinced Plaintiff Kafka to follow their instructions and invest with them in PFG. Pursuant to the Defendants' instructions, on the afternoon of July 6, 2012, Defendants instructed Mr. Kafka to send a wire in the amount of $250,000 to what was represented to be a PFG segregated funds account.

10.     The transfer was not consummated until after business hours on Friday, July 6, 2012 and on July 9, 2012 the funds were credited to Plaintiff's account.

11.     Plaintiff's losses are a direct and proximate consequence of Defendants' conduct.

Plaintiff sues under the Commodities Exchange Act, as intended beneficiaries of contracts made by Liberty, PFG, and others, and under principles of common law. He brings this action in an individual and representative capacity under Federal Rule of Civil Procedure 23.

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a) and 7 U.S.C. § 1 et seq. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), since there are at least 100 people in the proposed class, the combined claims of proposed class members exceed $5,000,000 exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

13.    Venue in this District is proper under 28 U.S.C. § 1391(b), 18 U.S.C. § 1965, 7 U.S.C. § 1, *et seq.*, and 7 U.S.C. § 25(c) because Defendants' unlawful course of conduct occurred in large part in this District and because the alleged conduct included violations of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*, and the Commodity Futures Trading Commission's regulations promulgated thereunder, 17 C.F.R. §§ 1.1, *et seq.*.

## III.    THE PARTIES

### A.    Plaintiffs

14.    Plaintiff, Joseph Kafka, is an individual residing in Naples, Florida.

### B.    Defendants

15.    Defendant Liberty Trading Group, Inc. ("Liberty") is a Corporation headquartered in Tampa, Florida.

16.    Defendant James Cordier is the founder, officer and principal of Liberty Trading Group, located in Tampa, Florida and exercised absolute control over all of Liberty's operations.

17.    Defendant Michael Gross is an officer and principal of Liberty Trading Group,

3

located in Tampa, Florida and exercised absolute control over Liberty's operations. Cordier and Gross are hereinafter referred to as "the Individual Defendants."

## IV. LIBERTY TRADING GROUP SOLICITED PLAINTIFF AND CLASS MEMBERS TO INVEST IN PFG

18.     Liberty and its principals solicited Mr. Kafka's investment in Liberty and Peregrine Financial Group ("PFG") and Peregrine Asset Management ("PAM").

19.     Mr. Kafka performed due diligence and questioned the Defendants about their recommended investment with Liberty and PFG. Defendants provided the Plaintiff with a "Frequently Asked Question" and answer solicitation. In it, Defendants represented:

Q:    What services can Liberty Trading Group provide to me?
A:    Liberty Trading Group offers a Professionally Directed Option Selling Account for high net worth investors. This account allows you to benefit from our specialized expertise in this form of investing.

Q:    Do you accept any accounts under your $250,000 minimum?
A:    No we do not.

Q:    Why should I open my account with you? What benefit do I receive?
A:    1.      Specialized Expertise.

**Q:    How safe are my funds with you in light of the MF Global incident in 2011?**
**A:    Your funds are on deposit through a third party clearing firm (PFG) and sit in a Customer Segregated Account at JPMorgan Chase Bank. Unlike MF Global, Peregrine Financial Group does not trade proprietary accounts (its own money). They are purely in the clearing business. The Customer segregated account system means your funds remain in an individual account under your name outside of PFG. Yours funds are not co-mingled with PFG funds. Liberty Trading funds other account funds. In the unlikely event that PFG or Liberty Trading Group would ever become insolvent, your funds remain safely outside of both firms.**

**Q:    I've read a few negative reviews about Liberty Trading Group online. Are you familiar with these and can you address them?**
**A:    Yes, we can thank you! When it's 99% good and 1% bad, people still gravitate towards the negative.**

20.    Cordier and Liberty Trading touted their special custodial, management, fiduciary, and investment credentials to Kafka. They stated, *inter alia*:

> "If you want to sell options as a serious investment, you don't want to put your capital into the hands of amateurs, fast talkers, or somebody who is not concentrating exclusively on selling options- especially when you are investing in commodities. At Liberty Trading Group, you truly are at **The Place for Yield Seeking Option Sellers**. You are unlikely to find any retail firm in the United States or elsewhere that can provide the expertise in this specialized niche of the investment world that you will find here. And it is all under one roof.
>
> My partner and I have a combined 42 years of commodities option trading experience. During those years, we have honed abilities to analyze and decipher the core fundamentals of each commodity, supply/demand equations, and seasonal analysis of market like coffee, soybeans, crude oil, and sugar.
>
> Our expertise in this field has been sought out and granted to some of the biggest names in the financial world. These individuals include **Larry Kudlow of CNBC, Robert Lenzer of Forces, Neil Cavuto and Liz Claman of Fox Business News, Dr. Donald Moine of Morningstar Advisors**, top reporters from the Wall Street Journal, Barrons Weekly, MarketWatch, Reuters World News, CNN Money, and of course, the fine publishers and editors at the McGraw-Hill company- who published both of our books."

A.    **PFG and the Governing Regulatory Framework**

21.    From its inception until its bankruptcy, PFG was a registered futures commission merchant, or FCM. At the time of its failure, PFG was the nation's second largest non-bank, non-clearing FCM. An FCM is an individual or organization that, among other things, solicits or accepts orders to buy or sell futures contracts or options on futures contracts, and accepts money or other assets from customers to support those orders. FCMs receive money, securities, and other property from their customers to margin, guarantee, or secure the customers' futures and options trades.

22.    FCMs like PFG are regulated by the Commodity Futures Trading Commission (CFTC), a federal agency, and the National Futures Association (NFA), a not-for-profit industry membership corporation that operates under the supervision of the CFTC. The CFTC regulates trading on the eleven United States futures exchanges, as well as commodity exchange members

5

and FCMs.  The NFA is responsible for overseeing the qualifications, proficiency, financial condition, retail sales practices, and business conduct of FCMs.

23.    The Commodity Exchange Act (CEA) and CFTC regulations require FCMs to maintain segregated and secure accounts for their customers' funds.  17 C.F.R. § 1.20(a).  Customer funds may not be commingled with the firm's operational funds and may not be used to margin or guarantee the trades or contracts, or to secure or extend the credit of, any other person or entity. *See id.*; *see also* 7 U.S.C. § 6d(a)(2).

24.    FCMs must file monthly financial reports with the CFTC known as "1-FR" reports.  These reports require FCMs to provide financial statements that show, among other things, the amount of customer funds the FCM has in segregated bank accounts.

**B.    Liberty Trading Group and PFG's Misuse of Customer Funds**

25.    Over the years, PFG received more than $200 million from customers, including at the request and with the participation of Liberty Trading.  But instead of keeping its customers' funds segregated as required by CFTC regulations, PFG withdrew money from the customer funds converted the money for the use of PFG, its affiliates, and Wasendorf personally.  Many of the transfers were made to the bank accounts of PFG-related entities, including other corporations Wasendorf owned or controlled.

26.    On or about November 1, 2011, following the collapse of MF Global, which resulted in the loss of over $1.6 billion in purportedly segregated customer funds, Liberty continued to tout PFG:

> PFGBEST is not only customer-centric, but compliance-focused.  We consider it a privilege to conduct business with you and to be an advocate for you.  We abide by all regulations mandated by the CFTC and the rules of NFA to hold customer funds in segregated accounts that are always separate from operational funds.  PFGBEST reports daily and monthly to the regulators concerning customer segregated funds. It is our policy to keep extra funds on deposit in our customer segregation accounts

to protect you.

27.     Under CFTC regulations, Liberty owes fiduciary duties to its customers with respect to their funds. 76 Fed. Reg. 78776-01, 78777 (Dec. 19, 2011) (FCMs are "bound by their fiduciary obligations to customers and the requirement that the secured amount required to be seaside be at all times liquid and sufficient to cover all obligations to such customers."). Liberty's acts and omissions violated its fiduciary duties to Plaintiff and the Class.

28.     Liberty must develop a Customer Due Diligence (CDD) program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides them with a way to identify unusual or suspicious transactions for each customer. The CDD program allows Liberty to maintain an awareness of the unique financial details of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

29.     Liberty must ensure compliance as a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations for its employees. Liberty must also train all operational personnel whose duties may require knowledge of the BSA, including identification of the various "red flags" discussed below.

30.     Because Liberty touted its allegedly superior services to Kafka and Class members, it was required to enhance their procedures, including applying a risk rating to PFG. To determine PFG's risk rating, Liberty was required to obtain customer information to develop a "customer transaction profile" that incorporated an understanding of normal and expected activity for PFG's business operations.

31.     Liberty knew that when customer funds are deposited in a bank, they are to be

7

deposited under an account name that clearly shows they are customer funds, segregated as required by the CEA. *See* 17 C.F.R. § 1.20. Liberty knew that any account held out as or named a customer segregated account would reasonably lead others to conclude the account maintained customer funds that were being segregated and protected consistent with the CEA rules and regulations. Liberty also assured Plaintiff, Kafka and the Class' of the legal operations of PFG.

32.    Liberty knew that it was a fiduciary to its customers with respect to the money they entrusted it and through its recommendations, to Plaintiff and Class members.

33.    PFG also made frequent electronic fund transfers and telephone transfers from the 1845 Account. Between January 1, 2010, and December 31, 2011, PFG made approximately 150 electronic transfers, over 95% of which were made into four of Wasendorf's other Liberty's accounts:    the Wasendorf Construction, Wasendorf & Associates, My Verona, and Wasendorf Air accounts. Between the same two dates, PFG also made 25 telephone transfers, all of which transferred funds into the same four Wasendorf accounts. On their face, these transfers were unlikely to constitute legitimate business transactions for PFG, such as a transfer of $135,000 in February 2011 to Wasendorf's restaurant, My Verona.

34.    Liberty knew that FCMs rarely, if ever, make withdrawals and transfers of this type size and frequency from their customer segregated accounts. CFTC regulations allow FCMs to deposit their own funds into their customer segregated accounts, since any excess funds will further protect customers in a volatile market. These excess funds are the only funds the FCM is permitted to withdraw for its own use. 17 C.F.R. § 1.23. Liberty's had no basis for believing that the transfers into and out of the 1845 Account involved PFG excess funds. 53.    The Federal Financial Institutions Examination Counsel (FFIEC) has

identified "red flags" that should have caused Liberty or its employees to inquire further and potentially file a suspicious activity report. PFG's 1845 Account triggered at least the following "red flags":

    a.       Inconsistent deposit and withdrawal activity;

    b.       Frequent deposits or withdrawals with no apparent business source;

    c.       Transactions that are not consistent with the customer's business;

    d.       Intrabank transfers between accounts owned or controlled by common individuals;

    e.       Large balances in non-interest bearing accounts;

    f.       Appearance of using account as a temporary repository for funds;

    g.       Deposits and immediate requests for wire transfers or cash shipments; and

    h.       Large deposits and balances.

    35.      Liberty should have also performed enhanced due diligence of certain accounts and customers that present a greater potential for violations of the BSA, including FCMs like PFG but did not do so and recklessly disregarded the duties owed to Plaintiffs and all Class members it had solicited.

    **C.**      **Liberty Continued to Solicit Funds Despite Many Additional Red Flags**

    **1.**      **Liberty Did Not Receive Balance Confirmation Requests.**

    36.      Liberty knows that the CFTC and the NFA require FCMs to maintain a minimum amount of "adjusted net capital." Adjusted net capital is a critical measure for FCMs. If it falls below proscribed limits, the FCM must "transfer all customer accounts and immediately cease doing business as a futures commission merchant" until it can reestablish the minimum threshold. See 17 C.F.R. § 1.17(a)(4).

37.     To track net capital, the CFTC and the NFA require FCMs to submit monthly unaudited financial statements and annual audited financial statements. *See* 17 C.F.R. § 1.10. FCMs file 1-FR forms on a monthly and yearly basis. The forms state the FCM's net capital requirement and actual net capital.

38.     Liberty also knows that the NFA sends balance confirmation requests to banks that hold a material portion of an FCM's net capital to monitor the FCM's compliance. The NFA also sends balance confirmation requests if there are suspicious circumstances, suspected fraud, or past improper behavior by the FCM.

39.     FCMs' auditors also routinely sent balance confirmation requests to banks as part of the certified auditing process. Liberty is familiar with the auditing process performed according to AICPA or PCAOB standards, including the need for balance confirmations as part of that process.

**2.     Liberty Knew That PFG Was Not Earning Revenue From the 1845 Account and Was Not Profitable.**

40.     Liberty knows that FCMs ordinarily depend on revenue from customer segregated accounts through interest earnings or repurchase agreements. While PFG executed at least one repurchase agreement with Firstar, in the years leading up to PFG's bankruptcy in 2012, PFG was not earning interest on the 1845 Account and was not engaging in repurchase agreements with the 1845 Account funds.

41.     Liberty knew from PFG's 1-FR forms that PFG was maintaining a material portion of its reported net capital—typically well in excess of 10% of its total reported net capital—in the 1845 Account.

42.     Liberty also knew that PFG was not profitable from its inception through at least 2005 and that, during the few years that PFG accrued profits, those profits were only

about $1-2 million annually.

### 3. PFG's Record of Regulatory Violations

43.     PFG's history of regulatory violations was available from the NFA's publicly- available database of its members' disciplinary history.  Some of these violations related to PFG's segregation of customer funds and reporting of net capital.

44.     In December 1996, the NFA's Business Conduct Committee ("BCC") issued a disciplinary complaint against PFG and a number of its associated persons alleging that they made misleading sales solicitations.  The complaint also charged PFG with using misleading  promotional material and failing to maintain copies of promotional material.  In addition, the  complaint alleged that PFG failed to correctly perform segregated funds computations, maintain  adequate segregated funds, and report to NFA that the firm was under segregated.  The complaint also charged PFG with supervisory failures.  PFG settled, agreeing to pay a $75,000 fine, tape record all of its associated persons' conversations for two years, create the position of Director of Compliance, and submit all promotional material to NFA prior to first use.

45.     In connection with the 1996 NFA disciplinary complaint, the NFA reportedly cited radio commercials in which PFG brokers claimed that the firm could turn a $10,000 investment into $80,000 in a matter of months.

46.     In 2000, PFG agreed to pay a $90,000 fine to settle a CFTC administrative proceeding alleging that PFG failed to notify the CFTC that its adjusted net capital was below the minimum required and the CFTC's "early warning threshold." The CFTC also alleged that PFG failed to keep accurate books and records and filed an inaccurate capital computation with the CFTC.

47.    In June 2004, the BCC issued a disciplinary complaint alleging that PFG failed to audit Dominick Concilio, a conditionally registered sole proprietor introducing broker guaranteed by PFG. PFG agreed to pay a $5,000 fine and adopt new procedures to ensure compliance with the NFA's order.

48.    In February 2012, the court-appointed receiver for a Ponzi scheme run by Trevor Cook sued PFG. The receiver alleged that PFG routinely ignored red flags about the operation of the Ponzi scheme and permitted the fraudster to open, manage and maintain trading accounts at PFG. Before his scheme was uncovered in 2009, over $190 million was stolen from investors, including about $30 million through accounts held at PFG. The discovery of the scheme was widely publicized. CNN, the Minnesota Star Tribune, and The New York Times all ran stories. PFG's involvement was a matter of public record and discussion as well.

49.    In February 2012, the BCC issued a disciplinary complaint against PFG, its president, Wasendorf Jr., and its chief compliance officer. The BCC alleged that PFG failed to supervise four of its guaranteed introducing brokers, or GIBs, who engaged in deceptive sales practices and made trade recommendations that maximized commissions without regard for the best interests of their customers. To settle the matter, PFG agreed to pay a $700,000 fine and refrain from any new guarantee agreements with introducing brokers for two years. PFG also agreed to hire an independent consultant to review its procedures for supervising its GIBs and retail customer accounts, and to designate an individual to act as its full-time anti-money- laundering officer. The NFA publicly reported PFG's $700,000 fine and PFG included the fine on its financial statements, including statements it provided to Liberty's.

50.     The size and frequency of these transfers made it obvious the transfers were not being made to PFG customers and were not instances of PFG removing its own excess funds from the customer segregated account.   The wire transfers were suspicious for several reasons. They were irregular, for large, round amounts, and transferred to another bank even though JPMorgan held three other customer segregated accounts for PFG. In addition, JPMorgan had a contractual obligation to hold the money according to CEA and CFTC rules, which require it to be held only in proper, customer segregated accounts. But despite these suspicious circumstances and its obligations, JPMorgan transferred millions in PFG customer funds to a non-segregated account under the exclusive control of Wasendorf, in breach of contractual obligations undertaken by JPMorgan for the benefit of Plaintiffs.

## D.     TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

51.     Plaintiffs and the proposed Class members did not discover the facts constituting Defendants' violations until after July 9, 2012, when Wasendorf's attempted suicide and admission of fraud triggered a robust investigation of PFG. Defendants never disclosed the material facts set forth herein to Plaintiff and Class members. Plaintiff learned of the actions of PFG and Wasendorf, and the actions and inaction of the Defendants, through personal interviews and their independent investigation. Plaintiffs then retained counsel.

52.     Plaintiffs and Class members could not reasonably have discovered the facts constituting Defendants' violations until after the law enforcement and regulatory investigations began on July 9, 2012.  Until then, Plaintiffs and Class members received account information from Liberty that did not show a discrepancy or shortfall in their account balances and recklessly failed to disclose the facts known to them concerning PFG and its operations.

53.    Because Plaintiff and Class members could not have reasonably discovered the facts constituting Defendants' violations until July 9, 2012, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

E.    **CLASS ACTION ALLEGATIONS**

54.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons and entities who were solicited by the Defendants to invest in PFG. Excluded from the Class are all Defendants, all members of the immediate families of the Defendants, all other officers, directors, and managing agents of the Defendants including all PFG affiliates and subsidiaries.

55.    The Class satisfies the requirements of Rule 23(a), as well as 23(b)(1)(B) and 23(b)(3).

56.    Numerosity. The members of the Class are so numerous that joinder of all members is impracticable. The size of the Class, which is estimated to consist of 5,000 individuals and business entities, can only be ascertained through discovery.

57.    Typicality. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

58.    Adequacy. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation, and securities and commodities related litigation.

59.    <u>Commonality and Predominance.</u>  Common questions of law and fact exist as to all members of the proposed class and predominate over any questions solely affecting individual members of the proposed class. The questions of law and fact common to the class include:

14

a.      whether Defendants breached duties to the Plaintiff and the members of the proposed class;

b.      whether the Defendants are liable to the proposed class;

c.      whether the Defendants assets are sufficient to compensate the members of the proposed class for their losses, and if not, whether the assets of the Defendants should be equitably divided among all class members according to their respective losses;

d.      whether Defendants knew or should have known that PFG was representing that an account maintained by PFG was a customer segregated account;

e.      whether Defendants are estopped from denying that PFG maintained a customer segregated account for the benefit of Liberty's and PFG's customers;

f.      whether Defendants disregarded "red flags" suggesting that PFG and Wasendorf might be using the services of Liberty to perpetrate a fraud on their customers;

g.      whether Defendants owed a legal duty to Plaintiff and customers concerning PFG;

h.      whether Defendants breached a legal duty to customers concerning PFG;

i.      whether any breach of duty on the part of Liberty is the legal cause of any damages suffered by Plaintiff and Class members;

j.      whether Liberty represented to Plaintiff and customers of Liberty that PFG maintained a customer segregated account with JPMorgan;

k.      whether Liberty knew or should have known of any diversion or misuse of customer funds on deposit with JPMorgan;

l.      whether Liberty disregarded "red flags" suggesting that PFG and

Wasendorf might be using the services of JPMorgan to perpetrate a fraud on their customers and otherwise recklessly disregarded and the facts failed to exercise reasonably due diligence;

       m.      whether Plaintiff and Class members are entitled to damages.

51.     The Class may be certified under Rule 23(b)(1)(B). Unless Defendants' combined unencumbered assets are equal to the shortfall in the segregated customer accounts at PFG, the prosecution of separate actions by individual customers of Liberty would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other customers who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

52.     The Class may also be certified under Rule 23(b)(3). Questions of law or fact common to class members predominate over any questions affecting only individual members. A class action under Rule 23(b)(3) is also superior to all other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no unusual difficulty in the management of this action as a class action.

**COUNT I**
**Fraud by Omission**
**(Against All Defendants)**

53.     Plaintiffs incorporate by reference the foregoing allegations as contained in paragraph 1-52 as if fully set forth herein.

54.     Both the Individual Defendants and Liberty's failure to disclose to Plaintiff and to other members of the proposed class all of the facts known to them as set forth above,

16

including that (i) PFG was holding the 1845 Account out to be a customer segregated account, (ii) the 1845 Account was not actually designated a customer segregated account, (iii) PFG was using other persons' and entities' mistaken belief that the 1845 Account was a customer segregated account to draw customer funds into the 1845 Account, and (iv) PFG was misappropriating the customer funds in the 1845 Account by failing to segregate them and by spending them or allowing them to be spent for the benefit of PFG, its affiliates, Wasendorf, and other non-PFG customers.

55.    Liberty's had a legal duty to disclose its knowledge because it had superior knowledge of the above facts and far more experience dealing with FCMs, segregation requirements, and related requirements than Liberty's customers. In addition, Plaintiff and other members of the proposed class trust and have confidence in Liberty to disclose such knowledge, based upon its representations. Further, Liberty's is in a position of influence and superiority over and a fiduciary to Plaintiff and the other members of the proposed class.

56.    Liberty's knowledge, had it been disclosed, would have been material to Plaintiff and the other members of the proposed class. The facts known to Liberty, stated above and throughout the complaint, substantially affected the interests of the Plaintiff and the other members of the proposed class, and the non-disclosure of that knowledge induced Plaintiffs and other members of the proposed class to act, including by mailing or wiring their money to PFG or continuing to entrust their money to PFG. Plaintiffs and the other members of the proposed class would not have mailed or wired their money to PFG or continued to entrust their money to PFG had Liberty disclosed its knowledge to them.

57.    Liberty knew that Plaintiff and other members of the proposed class did not

17

share Liberty's knowledge of the facts stated above and throughout the complaint and knew that Plaintiff and other members of the proposed class would not have expected those facts to be false. Alternatively, Liberty acted with reckless disregard for the truth.

58.     The Individual Defendants and Liberty acted with intent to deceive and an intent to induce action by Plaintiff and other members of the proposed Class because, among other things, the necessary and foreseeable consequences of their failure to disclose its knowledge was that Plaintiff and other members of the proposed class would mail or wire their money to PFG or continue to entrust their money to PFG.

59.     Plaintiff and other members of the proposed class acted in justifiable reliance on Defendants' failure to disclose its knowledge when they instructed Plaintiff to wire PFG their money or when they continued to recommend to Plaintiff that he entrust his money to PFG. Plaintiff and other members of the proposed class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (i) their lack of access to the facts Defendants knew, (ii) Defendants fiduciary status, (iii) Defendants concealment of the information, (iv) their inability to detect the fraud, and (v) the nature of the omitted information. Had Defendants disclosed its knowledge to Plaintiff and the other members of the proposed class, they would not have mailed or wired their money to PFG or would not have continued to entrust their money to PFG.

60.     As a direct and proximate result of Defendants failure to disclose its knowledge, Plaintiff and other members of the proposed class suffered and will continue to suffer damages.

**COUNT II**
**Negligence**
**(Against All Defendants)**

61.     Plaintiff incorporates by reference the foregoing allegations as contained in

paragraph 1-52 as if fully set forth herein.

62. The Individual Defendants and Liberty knew the deposits made by Plaintiff were customer funds, which raised certain regulatory requirements concerning the management of those funds.

63. Each of the Defendants knew that PFG was representing that the 1845 Account was a customer segregated account even though it was not formally designated as such.

64. Each of the Defendants was familiar with FCMs and the regulatory restrictions imposed on FCMs by the CEA, the NFA, and the CFTC.

65. Because each of the Defendants knew that Plaintiff's and other PFG customers' funds were intended for customer segregated accounts, because Defendants knew PFG was misrepresenting that its 1845 Account was a customer segregated account, because Defendants knew about the regulatory restrictions concerning such accounts, and because Liberty knew that it was subject to certain regulatory requirements concerning account monitoring and compliance, Liberty had a duty to Plaintiff and other members of the proposed class to monitor and safeguard customer segregated funds deposited with the Defendants by PFG.

66. Each of the Defendants breached its duty to Plaintiff and other members of the proposed class in the manner described above and in the following respects:

  (a) Failing to identify, monitor, or exercise any due diligence related to discrepancies and inconsistencies concerning PFG's deposits of the funds of Plaintiff and other members of the proposed class;

  (b) Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of the funds of Plaintiff and other members of the proposed class;

19

    (c)      Failing to identify, monitor, or exercise any due diligence related to the regulatory and compliance "red flags" identified herein;

    (d)      Failing to identify, monitor, or exercise any due diligence related to PFG not treating the 1845 Account as a customer segregated account;

    (e)      Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for the operational expenses of PFG;

    (f)      Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for non-PFG entities;

    (g)      Failing to notify Plaintiff, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about PFG's and Wasendorf's misappropriation of funds designated for customer segregated accounts;

    (h)      Causing and allowing customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers.

67.    As a direct and proximate consequence of each of the Defendants' conduct as described in the foregoing and throughout this complaint, Plaintiff and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG, have been denied the use of their assets since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial. The harm suffered by Plaintiff and members of the proposed class was the foreseeable result of the Defendants' conduct.

## COUNT III
**Breach of Fiduciary Duty**
**(Against All Defendants)**

68.    Plaintiffs incorporate by reference the foregoing allegations contained in paragraphs 1 through 52 as if fully set forth herein.

69.    Each of the Defendants was on actual or inquiry notice that a diversion of fiduciary funds by Wasendorf and PFG would occur or was ongoing.

70.    Each of the Defendants knowingly breached its fiduciary duties to its commodity customers by, among other things:

(a)    Failing to identify, monitor, or exercise due diligence related to discrepancies and inconsistencies concerning PFG's deposits of Plaintiff's and other proposed class members' funds;

(b)    Failing to implement and adhere to compliance and monitoring protocols concerning PFG's use of Plaintiffs' and proposed class members' funds;

(c)    Failing to identify, monitor, or exercise due diligence related to the regulatory and compliance "red flags" identified herein;

(d)    Failing to identify, monitor, or exercise due diligence related to PFG not treating the 1845 Account as a customer segregated account;

(e)    Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for the operational expenses of PFG;

(f)    Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for PFG, its affiliates, Wasendorf, and other non-PFG customers;

(g)    Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about PFG and Wasendorf's misappropriation of funds designated for customer segregated accounts;

21

and

      (h)     Causing and allowing customer assets to be misappropriated for the use

of PFG, its affiliates, Wasendorf, and other non-PFG customers.

71.     As a direct and proximate consequence of the conduct of each of the Defendants, as described in this complaint, Plaintiff and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading or to support securities transactions, have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined at trial.

**COUNT IV**
**Breach of Fiduciary Duty**
**(Against Individual Defendants)**

72.     Plaintiffs incorporate by reference the allegations in paragraph 1-52 as if fully set forth herein.

73.     As senior officers of Liberty, James Cordier and Michael Gross, were responsible for preserving the safety and security of monies, securities, and property that Plaintiff and the members of the proposed class paid, delivered, and entrusted to them and to PFG to allow such customers to trade commodity futures and options contracts through Liberty.

74.     James Cordier and Michael Gross exercised dominion and control over Liberty's commodity customers' funds and property and were charged with the duty and responsibility to adopt, implement, and enforce stringent rules and procedures to segregate and separately maintain such property and to ensure that those assets were not used or applied for any improper purpose, including to fulfill or satisfy the financial obligations and liabilities of Liberty or its affiliates.

22

75.     As such, James Cordier and Michael Gross owed Liberty's commodity customers, including Plaintiffs and the members of the proposed class, a fiduciary duty to preserve and protect their customer funds and property, to segregate and separately maintain these assets to act solely in the customer's best interests in connection with its custody and control of their assets, and to avoid any self-dealing or conduct on behalf of Liberty to the detriment of customers.

76.     Further, as the sole shareholders of Liberty, James Cordier and Michael Gross owed Liberty and its customer and creditors additional fiduciary duties arising from their effective control of Liberty.

77.     James Cordier and Michael Gross breached their fiduciary duties to Plaintiff and the other members of the proposed class by, among other things, intentionally, knowingly, recklessly, willfully or negligently:

(a)     Using or directing, authorizing, or causing the use of, the funds of PFG's commodity customers for the benefit of Liberty's, its affiliates, Wasendorf, and other non- PFG customers;

(b)     Employing procedures that did not ensure that customer funds, deposited for commodity futures trading, funds, would be treated as belonging exclusively to customers;

78.     As a direct and proximate consequence of the conduct of James Cordier and Michael Gross as described in this complaint, Plaintiff and the other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to Liberty to margin, guarantee, or secure their commodity or options trading or to support securities transactions, have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined at trial.

**COUNT V**
**Aiding And Abetting Direct Violations Of The Commodity Exchange**
**Act (Against the Individual Defendants)**

79.     Plaintiff incorporates by reference all of the allegations in paragraphs 1-52 as if fully set forth herein.

80.     Plaintiff brings this Count against James Cordier and Michael Gross under Sections 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) for aiding and abetting direct violations of the CEA and applicable CFTC regulations by PFG and Wasendorf.

81.     Cordier and Gross aided, abetted, counseled, induced, and/or procured violations by PFG and of Section 4d of the CEA (7 U.S.C. § 6d) and Sections 1.20(a), 1.20(c), and 30.7(a) of the CFTC Regulations regarding the segregation and maintenance of customer funds, and acted in concert and combination with PFG and each other in such violations by, among other things, intentionally, knowingly, recklessly, or willfully:

  (a)     Using, or directing, authorizing, or causing the use of the Plaintiff's funds at PFG's and for the benefit of PFG, its affiliates, and other non-PFG customers;

  (b)     Using, or directing, authorizing, or causing the use of the Plaintiff's funds at PFG to margin or guarantee the trades or contracts, or to secure or extend the credit, of PFG or its affiliates, and/or any other customer or person other than the PFG customer for whom the property was held;

  (c)     Employing procedures at Liberty that did not ensure that customer funds, deposited for commodity futures trading, including 4d and 30.7 funds, would be treated as belonging exclusively to commodity customers; and

  (d)     Obligating PFG customer funds for purposes other than to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity

option transactions of such customers.

82.    Wasendorf Jr. participated directly or indirectly through PFG in commodities transactions by receiving deposits, money, securities, or property from the Plaintiffs and the members of the proposed class in connection with or with the expectation of a contract of sale of commodities for future delivery and otherwise participated in the transactions set forth in Section 25 of the CEA (7 U.S.C. § 25(a)(1)(A)-(D)).

83.    PFG was capable of operating and meeting its obligations under the CEA and CFTC regulations only through its senior management, including Wasendorf Jr. who had control over PFG and direct supervisory responsibility and authority to ensure that PFG properly implemented and carried out the customer segregation requirements imposed under the CEA and CFTC regulations.

84.    As a direct and proximate consequence of James Cordier and Michael Gross conduct as described in this complaint, Plaintiff and the members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading, have been denied the use of their customer funds since no later than July 9, 2012, and have been damaged thereby at an amount to be determined at trial.

**COUNT VI**
**(Violation of Section 4b(a)(2)(A), (B) and (C) of the CEA**
**(Fraud in Connection with Commodity Futures**
**Contracts) (Against All Defendants)**

85.    Plaintiff incorporates by reference all of the allegations set forth in paragraphs 1-52 as if fully set forth herein.

86.    Section 4b(2)(A), (B) and (C) of the CEA, 7 U.S.C. § 6b(a)(2) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making

of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 7a (g) of this title, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market -- (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person....

87.     As a direct and proximate result of the wrongful conduct of James Cordier and Michael Gross, and Liberty, Plaintiffs and the other proposed class members suffered and will continue to suffer damages.

88.     Plaintiffs and the members of the proposed class who deposited with or paid to PFG money, securities, or property in order to engage in commodity futures or options contract trading other than on or subject to the rules of a designated contract market in the United States are each entitled to actual damages for the violations of the CEA alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment:

(a)     certifying the class, appointing Plaintiff as representative of the class, and appointing Plaintiff's counsel as class counsel;

(b)     awarding damages, including pre-judgment interest, on each claim in an amount to be established at trial;

(c)     awarding punitive damages in an amount to be established at trial;

(d)     impressing a constructive trust on the ill-gotten gains of Defendants in

26

the ultimate res of which each proposed class member shall have an undivided

interest;

    (e)    for reasonable attorneys' fees and costs of investigation and litigation; and

    (f)    granting such other relief as to this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules

of Civil Procedure, of all issues so triable.

Dated:  April 3, 2014

Kenneth G. Gilman
Florida Bar No. 340758
GILMAN LAW LLP
3301 Bonita Beach Road
Suite 202
Bonita Springs, FL 34134
Telephone: (239) 221-8301
Facsimile: (239) 676-8224
kgilman@gilmanlawllp.com

*Counsel for Plaintiffs and the Proposed
Class*